26

Zev Shechtman (Bar No. 266280)
*zev.shechtman@saul.com*
Mark Minuti (Admitted pro hac vice)
*mark.minuti@saul.com*
Turner N. Falk (Admitted pro hac vice)
*turner.falk@saul.com*
**SAUL EWING LLP**
1888 Century Park East, Suite 1500
Los Angeles, California 90067
Telephone: (310) 255-6100
Facsimile: (310) 255-6200

Attorneys for Hronis, Inc. and affiliated Debtors and Debtors in Possession



**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF CALIFORNIA**
**FRESNO DIVISION**

| | |
|---|---|
| In re<br><br>HRONIS, INC., a California corporation, et al.,<br><br>Debtors in Possession | Case No. 1:26-bk-10978<br><br>Chapter 11<br><br>SE-1<br><br>(Jointly Administered with Case Nos. 1:26-bk-10979, 1:26-bk-10980, 1:26-bk-10981, 1:26-bk-10982, 1:26-bk-10983, 1:26-bk-10984, 1:26-bk-10986, 1:26-bk-10987, and 1:26-bk-10988) |
| DLP FUNDING LLC, a New York limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>HRONIS, INC., a California corporation; HRONIS FRUIT COMPANY LLC, a California limited liability company; HRONIS RANCH, LLC, a California limited liability company; HRONIS CITRUS, LLC, a California limited liability company; and DOES 1 through 20, inclusive,<br><br>Defendants. | Adv. Pro. No. 1:26-ap-01017<br><br>**DEBTOR DEFENDANTS' ANSWERS AND AFFIRMATIVE DEFENSES AND COUNTERCLAIM PLAINTIFFS' COUNTERCLAIMS IN RESPONSE TO COMPLAINT TO DETERMINE INTEREST IN PROPERTY OF PRE-PETITION ACCOUNTS AND RELATED RELIEF** |

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Hronis, Inc., a California corporation ("**Hronis**"), Hronis Fruit Company LLC, a California limited liability company ("**Hronis Fruit**"), Hronis Ranch, LLC, a California limited liability company ("**Hronis Ranch**") and Hronis Citrus, LLC, a California limited liability ("**Hronis Citrus**," together with Hronis, Hronis Fruit and Hronis Ranch, the "**Debtor Defendants**" or "**Counterclaim Plaintiffs**"), by and through their undersigned counsel, file their answers, affirmative defenses and counterclaims (collectively, the "**Answer**") to the *Complaint to Determine Interest in Property of Pre-Petition Accounts and Related Relief* [D.I. 1] (the "**Complaint**"), filed by plaintiff DLP Funding, LLC ("**Plaintiff**" or "**DLP**"), and state as follows:

**PRELIMINARY STATEMENT**

1. The Debtor Defendants admit that the action seeks a determination that certain pre-petition accounts receivable being held by account debtors are not property of the Debtor Defendants' estates. The balance of the allegations of paragraph 1 of the Complaint are denied.

**PARTIES**

2. The Debtor Defendants admit the allegations of paragraph 2 of the Complaint on information and belief.

3. The Debtor Defendants admit the allegations of paragraph 3 of the Complaint.

4. No answer required as the allegations of paragraph 4 of the Complaint are directed at defendants other than the Debtor Defendants. To the extent an answer is required, the Debtor Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 4 of the Complaint.

5. No answer required as the allegations of paragraph 5 of the Complaint are directed at defendants other than the Debtor Defendants. To the extent an answer is required, the Debtor Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5 of the Complaint.

**JURISDICTION AND VENUE**

6. The Debtor Defendants admit the allegations of paragraph 6 of the Complaint.

7. The Debtor Defendants admit that the proceeding is brought pursuant to Bankruptcy Code section 541 and Federal Rule of Bankruptcy Procedure 7001(b), that the proceeding is

recognized by the bankruptcy code and that this is a core proceeding. The Debtor Defendants deny the balance of the allegations of paragraph 7 of the Complaint.

8. No answer required, as paragraph 8 of the Complaint contains the Plaintiff's consent to the entry of a final order.

9. The Debtor Defendants admit the allegations of paragraph 9 of the Complaint.

**FACTUAL BACKGROUND**

10. The Debtor Defendants admit that they were parties to the November 14, 2025 Merchant and Security Agreement (the "**MSA**") attached to the Complaint at Exhibit 1. The Debtor Defendants deny the balance of the allegations of paragraph 10 of the Complaint.

11. The Debtor Defendants deny the allegations of paragraph 11 of the Complaint.

12. The Debtor Defendants deny the characterization of the MSA as a "Purchase Agreement," but otherwise admit the allegations in paragraph 12 of the Complaint.

13. The Debtor Defendants admit that DLP filed the UCC-1 Financing Statement attached to the Complaint at Exhibit 2 on November 25, 2025, but deny any description or characterization of such statement that is inconsistent with the UCC-1 Financing Statement itself.

14. The Debtor Defendants admit that paragraph 14 of the Complaint purports to describe the MSA. The Debtor Defendants deny any description or characterization of the MSA that is inconsistent with the MSA itself or the true nature of the transaction under the MSA. The Debtor Defendants further deny that the MSA is enforceable after the Stipulation of Settlement (Complaint Exhibit 3) (the "**Settlement Stipulation**") and entry of the judgment (Complaint Exhibit 4) (the "**Judgment**").

15. The Debtor Defendants admit that they defaulted under the MSA and did not make a remittance under the MSA to DLP. The Debtor Defendants further admit that portions of paragraph 15 of the Complaint purport to describe the MSA. The Debtor Defendants deny any description or characterization of the MSA that is inconsistent with the MSA itself or the true nature of the transaction under the MSA. The Debtor Defendants deny that the MSA is enforceable after the Settlement Stipulation and the entry of the Judgment. The Debtor Defendants lack knowledge

SAUL EWING LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
(310) 255-6100

or information sufficient to form a belief as to the truth of the allegations of paragraph 15 of the Complaint that the Debtors instructed the bank not to honor the ACH debits.

16. The Debtor Defendants admit that, on December 18, 2025, DLP filed the New York Action. The Debtor Defendants deny the balance of the allegations of paragraph 16 of the Complaint.

17. The Debtor Defendants admit that on December 22, 2025 the Debtor Defendants and DLP executed the Settlement Stipulation. The Debtor Defendants deny the balance of the allegations of paragraph 17 of the Complaint.

18. The Debtor Defendants admit that paragraph 18 of the Complaint purports to describe the Settlement Stipulation. The Debtor Defendants deny any description or characterization of the Settlement Stipulation that is inconsistent with the stipulation itself.

19. The Debtor Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 19 of the Complaint.

20. The Debtor Defendants admit the allegations of paragraph 20 of the Complaint.

21. The Debtor Defendants admit the allegations of paragraph 21 of the Complaint.

22. The Debtor Defendants admit that, on the Petition Date, account debtors were holding payment of amounts due to the Debtor Defendants and that DLP disputes that the Debtor Defendants retained any interest in the amounts due and asserts that it purchased such amounts. The Debtor Defendants deny the balance of the allegations in paragraph 22 of the Complaint.

23. The Debtor Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 23 of the Complaint.

24. The Debtor Defendants admit that DLP seeks the judgment and the order described in paragraph 24 of the Complaint, but denies that DLP is entitled to such a judgment or order. The Debtor Defendants otherwise deny the allegations of paragraph 24 of the Complaint.

**CLAIM FOR RELIEF**

25. The Debtor Defendants repeat each and every answer to the foregoing allegations and incorporates the same by this reference as through set forth here in full.

26. The Debtor Defendants deny the allegations of paragraph 26 of the Complaint.

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

27. The Debtor Defendants deny the allegations of paragraph 27 of the Complaint.

28. The Debtor Defendants deny the allegations of paragraph 28 of the Complaint.

29. The Debtor Defendants deny the allegations of paragraph 29 of the Complaint.

29.1 The Debtor Defendants admit that paragraph 29.1 of the Complaint purports to contain a description of the MSA. The Debtor Defendants deny any description or characterization of the MSA that is inconsistent with the MSA itself or the true nature of the transaction under the MSA.

29.2 The Debtor Defendants admit that paragraph 29.2 of the Complaint purports to contain a description of the MSA. The Debtor Defendants deny any description or characterization of the MSA that is inconsistent with the MSA itself or the true nature of the transaction under the MSA. The Debtor Defendants further deny that all of the risk of non-collection was on DLP or that the MSA is enforceable following the Settlement Stipulation and entry of the Judgment.

29.3 The Debtor Defendants deny the allegations of paragraph 29.3 of the Complaint.

29.4 The Debtor Defendants deny the allegations of paragraph 29.4 of the Complaint.

30. The Debtor Defendants deny the allegations of paragraph 30 of the Complaint.

31. The Debtor Defendants deny the allegations of paragraph 31 of the Complaint.

32. The Debtor Defendants deny the allegations of paragraph 32 of the Complaint.

33. The Debtor Defendants deny the allegations of paragraph 33 of the Complaint.

## STATEMENT REGARDING ENTRY OF ORDER OR JUDGMENT IN ADVERSARY PROCEEDING

Pursuant to Rules 7008 and 7012(b) of the Federal Rules of Bankruptcy Procedure, the Debtor Defendants consent to the entry of final orders or judgments in this Adversary Proceeding by the United States Bankruptcy Court for Eastern District of California (the "**Bankruptcy Court**").

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**AFFIRMATIVE DEFENSES**

Without admitting or acknowledging that they bear any burden of proof as to any of them, or that such matters are not elements of the Plaintiff's *prima facie* case, the Debtor Defendants assert the following affirmative defenses, pled in the alternative to the extent that they may be found to be inconsistent. The Debtor Defendants reserve the right to amend their Answer to supplement or delete these defenses, or assert further defenses, as justice may require.

**FIRST DEFENSE**

The Complaint fails to state a claim upon which relief can be granted.

**SECOND DEFENSE**

DLP's claims are barred, in whole or in part, as a result of accord and satisfaction.

**THIRD DEFENSE**

DLP's claims are barred, in whole, or in part, as a result of the doctrines of merger, collateral estoppel and/or res judicata.

**FOURTH DEFENSE**

DLP's claims are barred, in whole or in part, by the Settlement Stipulation and/or the entry of the Judgment.

**FIFTH DEFENSE**

DLP's claims are barred, in whole or in part, by the doctrine of waiver.

**SIXTH DEFENSE**

DLP's claims are barred, in whole or in part, by the doctrine of unclean hands.

**SEVENTH DEFENSE**

DLP's claims are barred, in whole or in part, by its own inequitable conduct.

SAUL EWING LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
(310) 255-6100

**EIGHTH DEFENSE**

DLP's claims are barred, in whole or in part, because the MSA violates California's usury laws.

**NINTH DEFENSE**

The Debtor Defendants will rely on such other defenses as may become available by law, or pursuant to statute, and hereby reserve the right to amend their Answer to assert such defenses.

WHEREFORE, the Debtor Defendants are entitled to the entry of judgment denying all of the relief sought in the Complaint, dismissing DLP's claims with prejudice, and granting to the Debtor Defendants such other and further relief as the Bankruptcy Court may deem just and proper.

**COUNTERCLAIMS**

For their counterclaims against DLP, the Counterclaim Plaintiffs hereby incorporate the allegations of the Complaint and the answers to the same as set forth above and allege, as follows:

**NATURE OF COUNTERCLAIMS AGAINST DLP**

1. By their counterclaims, the Counterclaim Plaintiffs seek alternative forms of declaratory relief that (a) the MSA is unenforceable; (b) DLP did not purchase the Pre-Petition Accounts; (c) the MSA is a disguised loan and not a sale of future receivables; and (d) the MSA imposes a usurious rate of interest, and therefore, the interests, fees and expenses charged by DLP are void. The Counterclaim Plaintiffs further seek a determination that (a) DLP's claims, if allowed, are general unsecured claims and that its alleged lien on any of the Counterclaim Plaintiffs' assets are avoided under 11 U.S.C. §§ 506(a) and (d); and (b) that the purported liens, obligations and sales under the MSA constitute a constructive fraudulent conveyances pursuant to 11 U.S.C. § 548(a) and that the Counterclaim Plaintiffs may recover any avoided liens pursuant to 11 U.S.C. §§ 550 and 551.

**THE COUNTERCLAIM PARTIES**

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

2. On March 6, 2026 (the "**Petition Date**"), the Counterclaim Plaintiffs and certain of their affiliates (collectively, the "**Debtors**") commenced the above-captioned bankruptcy cases in the Bankruptcy Court (the "**Chapter 11 Cases**").

3. The Counterclaim Plaintiffs' principal place of business is located at 10443 Hronis Road, Delano, CA 93215-9556. Debtor Hronis is a California corporation. Each of Debtors Hronis Fruit, Hronis Ranch and Hronis Citrus are California limited liability companies.

4. No trustee has been appointed for any of the Debtors in the Chapter 11 Cases and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. Accordingly, the Counterclaim Plaintiffs have the authority to file and prosecute the counterclaims set forth herein.

5. Upon information and belief, DLP is a New York limited liability company with is principal place of business located in New York, New York.

**JURISDICTION AND VENUE OF COUNTERCLAIMS**

6. The Bankruptcy Court has jurisdiction over the Counterclaim Plaintiffs' counterclaims claims pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and (b).

7. The Counterclaim Plaintiffs' Counterclaims are core proceedings within the meaning of 28 U.S.C. § 157(b).

8. Pursuant to Rules 7008 and 7012(b) of the Federal Rules of Bankruptcy Procedure the Counterclaim Plaintiffs consent to the entry of final orders or judgments by the Bankruptcy Court on the Counterclaims.

9. Venue of the Counterclaim Plaintiffs' counterclaims in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

## COUNTERCLAIMS BACKGROUND

### A. The Conterra Loan Agreement

10. Prior to the Petition Date, the Debtors entered into a Loan and Security Agreement, dated October 29, 2024 (the "**Conterra Loan Agreement**"), with Conterra Agricultural Capital, LLC ("**Conterra**"), which provided for a revolving line of credit (the "**Line of Credit**") up to $55 million. By letter agreements dated April 9, 2025, and June 27, 2025, the amount of the Line of Credit was increased to $85,850,000.

11. As of the Petition Date, the amount owed by the Debtors to Conterra on the Line of Credit was approximately $70.68 million.

12. To secure their obligations to Conterra, the Debtors (other than debtors Hronis Ranch and Hronis Resource Management, LLC) granted a security interest to Conterra in, among other things, all of their personal property, including their "accounts," defined at section 1.1 of the Conterra Loan Agreement, generally, to include "all present and future right to payment of a monetary obligation, whether or not earned by performance."

13. A UCC-1 Financing Statement (the "**Conterra Financing Statement**") providing notice of Conterra's security interest was recorded with the California Secretary of State on October 29, 2024 as filing number U240083964841. A true and correct copy of the Conterra Financing Statement is attached hereto as **Exhibit 1** and is incorporated by reference herein.

### B. The Conterra DIP Loan

14. On April 24, 2026, the Bankruptcy Court entered the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Operation Cash Flow Financing and (B) Use Cash Collateral; (II) Granting (A) Liens and Providing Superpriority Administrative Claims and (B) Adequate Protection to Prepetition Secured Parties; (III) Modifying the Automatic Stay; (IV) Scheduling a Final DIP Hearing; and (V) Granting Related Relief* (Docket No. 258, the "**Final DIP Order**") authorizing the Debtors to obtain post-petition financing from Conterra and the consensual use of Conterra's cash collateral (the "**DIP Loan**").

15. As security for the Debtors' obligations under the DIP Loan, and subject to certain exceptions not applicable herein, Conterra was granted senior secured and priming security interests

in and liens on all the "DIP Collateral," which included all of the Debtors' accounts (the "**DIP Loan Lien**"). *See* Final DIP Order, ¶ 3(d) and (e).

16. The current principal amount owed by the Debtors to Conterra on the DIP Loan is approximately $18,275,000.

**C. The MSA**

17. On November 14, 2025, DLP, on the one hand and the Counterclaim Plaintiffs, and California Grape Growers Cooperative, International Fruit Company, Inc., Central California Orange Growers Cooperative, Shamrock Transport, LLC, and the Peter Hronis Company, LLC (collectively, with the Counterclaim Plaintiffs, the "**DLP Borrowers**"), on the other hand, entered into the MSA. A true and correct copy of the MSA is attached to the Complaint at Exhibit 1 and is incorporated by reference herein.

18. Under the MSA, DLP agreed to fund a total of $13,453,570.20 to the DLP Borrowers, on a weekly schedule set forth in the MSA.

19. In exchange for these funds, the MSA provided that DLP would sweep the DLP Borrowers' bank accounts for certain amounts on a weekly schedule set forth in the MSA.

20. DLP asserts that the DLP Borrowers agreed to sell, assign, and transfer to DLP 19.25% of the DLP Borrowers' "Future Receipts" under a schedule set forth in the MSA.

21. Pursuant to the MSA, the term "Future Receipts" is defined as "all payments made by cash, check, electronic transfer or other form of monetary payment deposited into Merchant Account(s)." *See* MSA, page 1.

22. The MSA included a "SECURITY AGREEMENT" pursuant to which the DLP Borrowers purported to grant DLP a security interest and lien upon all of their present and future "Secured Assets," defined to include: "(a) accounts (the "Accounts Collateral"), accounts receivables, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s); (b) all proceeds, as that term is defined in Article 9 of the UCC; (c) funds at any time in the Merchant's and/or Guarantor(s) Account, regardless of the source of such funds; (d) present and future Electronic Check

SAUL EWING LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
(310) 255-6100

Transactions; and (e) any amount which may be due to DLP FUNDING under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement…" *See* MSA, page 8.

23. The SECURITY AGREEMENT further provided that, if the funds in the DLP Borrowers' accounts were insufficient to cover DLP's entitlements under the MSA, then DLP "is granted a further security interest in all of [the DLP Borrowers'] assets of any kind whatsoever, and such assts shall then become Secured Assets." *Id.*

24. DLP recorded a UCC-1 Financing Statement (the "**DLP Financing Statement**") with the California Secretary of State on November 25, 2025, as filing number U250213981733. A true and correct copy of the DLP Financing Statement is attached hereto as **Exhibit 2** and is incorporated by reference herein.

25. Pursuant to a "GUARANTY OF PERFORMANCE" included in the MSA, Peter John Hronis and Kosta James Hronis (collectively, the "**Guarantors**") purported to guaranty the DLP Borrowers' obligations under the MSA. Although labeled as a guaranty of "performance," the guaranty provision of the MSA provides that "Each Guarantor shall be jointly and severally liable for all amounts owed to DLP FUNDING in the Event of Default." *See* MSA, page 9.

26. The DLP Borrowers and Guarantors are all residents of California.

27. The DLP Borrowers and Guarantors all have their principal places of business in California.

28. The MSA was executed in California.

29. The accounts of Counterclaim Plaintiff Hronis' account debtors which DLP claims it purchased under the MSA (collectively, the "**Pre-Petition Accounts**") were generated from Counterclaim Plaintiff Hronis' business activities taking place in California.

30. Counterclaim Plaintiffs' bank accounts are located in California.

31. The DLP Financing Statement was filed in California.

**D. The DLP State Court Action, Settlement Stipulation and Judgment**

32. On December 8, 2025, DLP filed a verified complaint (the "**DLP Complaint**") against the DLP Borrowers and the Guarantors instituting the New York Action.

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

33. The DLP Complaint alleged that DLP had procured a total of $3,664,482.52 of the DLP Borrowers' Future Receipts, that the DLP Borrowers defaulted under the MSA, and that the DLP Borrowers owed DLP $3,948,760.77 plus attorney's fees, prejudgment interest, and costs. *See* DLP Complaint at paragraphs 11–16.

34. Soon after DLP filed the DLP Complaint, however, the parties completely settled the claims asserted in the DLP Complaint, including any and all claims related to the MSA. On December 18, 2025, DLP, the DLP Borrowers, and the Guarantors entered into the Settlement Stipulation, a true and correct copy of which is attached to the Complaint at Exhibit 3 and is incorporated by reference herein. The Settlement Stipulation provided that:

> [T]he Parties wish to settle any claims, causes of action, rights and/or remedies, that were asserted, could have been asserted, should have been asserted and/or may exist from the beginning of time through the end of the world relating to the facts and circumstances arising from this Agreement and the terms set forth below.

*See* Settlement Stipulation § I.

35. The Settlement Stipulation required the DLP Borrowers and the Guarantors to pay DLP $3,325,000 on or before December 19, 2025. *See* Settlement Stipulation § II(A).

36. In the event that the DLP Borrowers and the Guarantors failed to make that payment, or breached the Settlement Stipulation, section II(D) of the Settlement Stipulation, titled "Default Under Agreement," provided for the following remedy:

> Pursuant to CPLR 3215(i), in the event Defendants fails to comply with this Agreement, Plaintiff shall have the right to enter judgment (the "Judgment") without further notice in the amount of $4,935,950.96 with Plaintiff providing to Defendants a credit for all monies paid under this Agreement, together with prejudgment interest of 16% from November 20, 2025, costs and disbursements, incurred by Plaintiff in connection with the Action and entering the Judgment.

*See* Settlement Stipulation at § II(D).

37. Effective on December 18, 2025, Section II(E) of the Settlement Stipulation includes a broad, non-contingent, general release from DLP in favor of the DLP Borrowers and the Guarantors, pursuant to which, *inter alia*, DLP released the DLP Borrowers:

> […] of and from any and all claims, actions, causes of action, suits, debts,

> dues, sums of money, accounts, interests, reckonings, bonds, bills specialties, covenants, contracts, controversies, promises, agreements, variances, trespasses damages, judgments, extends, executions, demands, obligations, costs, expenses, losses, exposures and liabilities whatsoever, of every name and nature, both in law and equity, known or unknown, which…[DLP] now have, ever had or shall later have, arising from, upon or by reason of any matter, cause of thing occurring at any time from the beginning of the world to the date hereof. . . .

*See* Settlement Stipulation § II(E).

38. To leave no doubt that the Parties' rights and obligations under the MSA were released in favor of the Settlement Stipulation, Section II(G) of the Settlement Stipulation titled "Entire Agreement/Amendments to the Agreement," provides, in part, that "[t]his Agreement is **the complete and entire agreement of the parties** and may not be modified, changed, contradicted, added to, or altered in any way by **any previous written or oral agreement** or any subsequent agreement. No amendment or variation of the terms of this Agreement shall be valid unless made in writing and signed by all Parties…." *See* Settlement Stipulation § II(E) (emphasis added).

39. The DLP Borrowers and Guarantors failed to pay the settlement proceeds by December 19, 2025 under the Settlement Stipulation.

40. On January 5, 2026, consistent with Section II(D) of the Settlement Stipulation, DLP obtained the Judgment against the DLP Borrowers and the Guarantors in the amount of "$4,935,950.96, together with 16% per annum from November 20, 2025, in the amount of $998,719.20, plus $490 in costs and disbursements as taxed by the Clerk, amounting in all to the sum of $5,035,160.16 and the Plaintiff have execution thereon." A true and correct copy of the Judgment is attached to the Complaint at Exhibit 4 and is incorporated by reference herein.

**E. DLP's Payover Notices**

41. Prior to the Settlement Stipulation and entry of the Judgment, DLP served notices (the "**Payover Notices**") on account debtors of Counterclaim Plaintiff Hronis, including Walmart, Inc. and Walmart International (collectively, "**Walmart**"), Costco Wholesale Corporation ("**Costco**"), ALDI, Inc. ("**ALDI**") and Loblaw Companies Ltd. ("**Loblaw**," collectively with Walmart, Costco and ALDI, the "**Identified Account Debtors**").

42. The Payover Notice sent to Walmart is titled "UCC LIEN NOTICE." A true and

SAUL EWING LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

correct copy of the Payover Notice sent to Walmart is attached hereto as **<u>Exhibit 3</u>** and is incorporated by reference herein.

43. As a result of the Payover Notices, the Identified Account Debtors refused to release amounts owed to Counterclaim Plaintiff Hronis.

44. Costco was holding $1,524,344.90 in funds owed to Counterclaim Plaintiff Hronis (the "**Costco Funds**"). Each of Walmart, ALDI and Loblaw are holding approximately $7.3 million, $792,000 and $197,000, respectively, of funds owed to Counterclaim Plaintiff Hronis (collectively the "**Withheld Funds**").

45. The Pre-Petition Accounts, including the Costco Funds and the Withheld Funds are property of Counterclaim Plaintiff Hronis' estate pursuant to 11 U.S.C. § 541.

46. Since the Petition Date, Counterclaim Plaintiff Hronis made repeated demands upon DLP to withdraw the Payover Notices and to consent to the turnover of funds being withheld by the Identified Account Debtors and others.

47. DLP refused to do so.

48. On May 11, 2026, the Bankruptcy Court entered the *Agreed Order (1) Denying Debtors' Motion for Entry of an Order Enforcing the Automatic Stay and Awarding Sanctions against DLP Funding, LLC; and (2) Approving Joint Instructions to Account Debtors Regarding Payment of Accounts Receivable to Segregated Account* [Bankruptcy Docket No. 287] (the "**Agreed Order**").

49. Consistent with the Agreed Order, the Costco Funds have been turned over to Counterclaim Plaintiff Hronis and have been deposited in a segregated account, subject to further order of the Bankruptcy Court. As of the date of this Answer, each of Walmart, ALDI and Loblaw are continuing to withhold the Withheld Funds.

## <u>COUNTERCLAIMS FOR RELIEF</u>

### <u>Count I: Declaratory Judgment that DLP Holds No Rights, Claims or Interests Under the MSA as a Result of the Settlement Stipulation</u>

50. The Counterclaim Plaintiffs repeat each averment above and incorporate the same by this reference as through set forth here in full.

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

51. The Settlement Stipulation was effective as of December 18, 2025.

52. Pursuant to the Settlement Stipulation, effective on December 18, 2025, DLP released and forever discharged the Counterclaim Plaintiffs from, *inter alia*, all claims, debts, interests and other rights DLP had pursuant to the MSA, including any rights, claims or interests in the Pre-Petition Accounts.

53. The Pre-Petition Accounts, including the Costco Funds and the Withheld Funds, are property of the respective Counterclaim Plaintiffs' estates pursuant to 11 U.S.C. § 541.

54. After the Settlement Stipulation became effective, DLP improperly continued to pursue its alleged rights, claims and interests under the MSA, including alleged, rights, claims and interests in the Pre-Petition Accounts.

WHEREFORE, the Counterclaim Plaintiffs request entry of a declaratory judgment that (i) Counterclaim Plaintiff Hronis owns, and has an interest in, the Pre-Petition Accounts; (ii) Counterclaim Plaintiff Hronis' interest in the Pre-Petition Accounts is property of its estate under 11 U.S.C. § 541; (iii) pursuant to the Settlement Stipulation, the MSA is no longer enforceable; and (iv) pursuant to the Settlement Stipulation, DLP has no rights, claims, or interests in the Pre-Petition Accounts.

**Count II: Declaratory Judgment that DLP's Rights, Claims and Interests Under the MSA and Settlement Stipulation Were Merged into the Judgment**

55. The Counterclaim Plaintiffs repeat each averment above and incorporate the same by this reference as through set forth here in full.

56. Under New York law, the related doctrines of *res judicata* and "merger of a judgment" are "based on a policy to prevent successive actions on the same cause." *Jay's Stores, Inc. v. Ann Lewis Shops, Inc.*, 15 N.Y.2d 141, 147, 204 N.E.2d 638, 641 (1965).

57. Once a judgment is entered, the "original claim is extinguished and rights upon the judgment are substituted for it." *Orix Credit All., Inc. v. Horten*, 965 F. Supp. 481, 485 (S.D.N.Y. 1997) *quoting* Restatement (Second) of Judgments § 18 (1980).

58. DLP commenced the New York Action to recover on claims arising from obligations under the MSA.

59. DLP obtained the Judgment on January 5, 2026.

60. DLP's rights, claims and interests under the MSA and Settlement Stipulation, whatever they were, were merged into the Judgment and, after entry of the Judgment, DLP was precluded from asserting any alleged rights claims or interests under the MSA.

61. DLP's remedy after the entry of the Judgment was to execute on the Judgment.

62. The Pre-Petition Accounts, including the Costco Funds and the Withheld Funds, are property of Counterclaim Plaintiff Hronis' estate pursuant to 11 U.S.C. § 541.

63. Following the extinguishment of DLP's purported rights, claims and interest under the MSA as a result of the Settlement Stipulation and Judgment, DLP continues to improperly assert alleged rights, claims and interests in the Pre-Petition Accounts under the MSA.

WHEREFORE the Counterclaim Plaintiffs request entry of a declaratory judgment that (i) Counterclaim Plaintiff Hronis owns, and has an interest in, the Pre-Petition Accounts; (ii) Counterclaim Plaintiff Hronis' interest in the Pre-Petition Accounts is property of its estate under 11 U.S.C. § 541; (iii) pursuant to the Judgment, the MSA is no longer enforceable; and (iv) DLP has no rights to the Pre-Petition Accounts on account of the merger of its purported rights, claims and interests under the MSA and Settlement Stipulation into the Judgment.

**Count III: Declaratory Judgment that DLP Did Not Purchase the Pre-Petition Accounts Pursuant to the MSA**

64. The Counterclaim Plaintiffs repeat each averment above and incorporate the same by this reference as through set forth here in full.

65. If the MSA represents a true sale of Future Receipts and not a disguised loan, the terms of the MSA control which Future Receipts were purchased and when.

66. The MSA provides that DLP is purchasing a percentage of "Future Receipts" on a weekly schedule. *See* MSA, page 1.

67. Future Receipts are defined in the MSA as certain amounts, once deposited into the "Merchants Account(s)." *Id.*

68. The Pre-Petition Accounts, including the Costco Funds and the Withheld Funds, were never deposited into any of the DLP Borrowers' accounts prior to the Petition Date.



SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

69. To the extent the MSA remains enforceable following entry into the Settlement Stipulation and entry of the Judgment, the Pre-Petition Accounts were never Future Receipts under the MSA and were not purchased by DLP.

70. That the Pre-Petition Accounts were not Future Receipts is evidenced by the title of the Payover Notices of "UCC LIEN NOTICE," which made clear that DLP was attempting to assert rights as a lien holder, and not the owner of the Pre-Petition Accounts.

71. Accordingly, at all times relevant to these Counterclaims, the Pre-Petition Accounts remained property of Counterclaim Plaintiff Hronis under 11 U.S.C. § 541.

WHEREFORE, the Counterclaim Plaintiffs request entry of a declaratory judgment that (i) the Pre-Petition Accounts were never purchased by DLP; and (ii) Counterclaim Plaintiff Hronis has an interest in the Pre-Petition Accounts; and (iii) Counterclaim Plaintiff Hronis' interest in the Pre-Petition Accounts is property of its estate under 11 U.S.C. § 541.

**Count IV: Declaratory Judgment that the MSA Represents a Disguised Loan and Not a Sale of Accounts Receivable or Future Receipts**

72. The Counterclaim Plaintiffs repeat each averment above and incorporate the same by this reference as through set forth here in full.

73. The MSA selects New York law.

74. Under New York law, a purported sale of receivables is a disguised loan if it imposes an absolute obligation to repay and shifts substantially all risk of nonpayment to the borrower. *AKF, Inc. v. W. Foot & Ankle Ctr.*, 632 F. Supp. 3d 66, 77 (E.D.N.Y. 2022) ("A loan entails an absolute contractual entitlement for repayment and allocates risk to the borrower; conversely, a sale affords only a conditional right for performance and allocates risk to the buyer.").

75. A purported sale of receivables is deemed a disguised loan based upon the consideration of a number of factors, including "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy," (4) whether there are default provisions entitling the lender to immediate repayment, and (5) whether the agreement allows collection on a personal guaranty. *LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 181 A.D.3d 664, 664-66 (2d

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Dept. 2020).

76. The transaction under MSA is a disguised loan and not a true sale of accounts receivable or Future Receipts for a host of reasons, including:

76.1 The reconciliation provision in the MSA § I.4 does not permit the DLP Borrowers to request an adjustment in the total amount the DLP Borrowers owe DLP, or the amount that must be paid weekly to DLP. It only permits the DLP Borrowers to request the retroactive adjustment of the most recent month's payment amount. *In re Anadrill Directional Servs. Inc.*, 676 B.R. 860, 870 (Bankr. S.D. Tex. 2026) (applying New York law, agreement is a disguised loan in part because "the reconciliation provision here does not allow for a change in the total amount [borrower] owes [lender], just the amount [borrower] owes in any given week") *citing In re Williams Land Clearing, Grading, & Timber Logger, LLC*, Nos. 22-02094-5-PWM, 23-00024-5-PWM, 2025 Bankr. LEXIS 1201, at *25 (Bankr. E.D.N.C. May 16, 2025).

76.2 The reconciliation provision in the MSA is illusory, given the amount of paperwork and onerous process needed to request and obtain a reconciliation, and DLP's wide discretion to determine the submitted paperwork is insufficient after the deadline to request a reconciliation has expired.

76.3 Although the MSA does not have an explicit finite term, the anticipated term of the MSA is easily calculated by adding up the eighteen scheduled payments and deducting the amount the Counterclaim Plaintiffs paid to DLP. *In re Anadrill Directional Servs. Inc.*, 676 B.R. at 870 (agreement is a disguised loan with a finite term in part because "the total amount [debtor-borrower] Anadrill owes in interest is easily calculated by adding up the forty-eight payments, and deducting the amount Anadrill paid to [lender], which indicates there is an absolute obligation to pay.") *citing CA Master Fund (MMF) v. Universal Scrap Motors Inc.*, 2021 N.Y. Slip Op. 30097(U), ¶ 4 (N.Y. Sup. Ct. 2021).

76.4 The MSA provides DLP extensive recourse in a bankruptcy. It includes a "SECURITY AGREEMENT" section that imposes a lien on all "Secured Assets." *See* MSA, page 11.

76.5 The lien on Secured Assets under the MSA extends beyond the Future

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Receipts that DLP allegedly purchased.

76.6 The MSA specifically contemplates that the extensive lien in all Secured Assets will be enforced in a bankruptcy, as it provides that "Merchant and Guarantor(s) agree(s) that this is a contract of recoupment and DLP FUNDING is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by DLP FUNDING." *See* MSA, page 11.

76.7 The MSA provides that, upon a default, DLP is entitled to the full "Purchased Amount" of $19,507,676.79 less amounts remitted, even if DLP did not fund that entire Purchased Amount as of the date of default. *See* MSA § I.13 (Protection 1: "The full Purchased Amount, less any amount already remitted, plus all fees (including reasonable attorney fees) due under this Agreement and the attached Security Agreement become payable upon Merchant's breach.").

76.8 The MSA provides that any default requires immediate repayment. *See* MSA § I.13.

76.9 The MSA includes a personal guaranty of the Guarantors, which may be enforced upon a default. *See* MSA at 9, 13.

76.10 The MSA contains other provisions that make clear that the risk of non-payment of the DLP Borrowers' accounts receivable remained with the DLP Borrowers at all time.

76.11 DLP "reserves the right to delay or rescind the offer to purchase any Increment or any additional Receipts, in its sole and absolute discretion." *See* MSA at § I.3.

76.12 DLP is granted a power of attorney to act for the Counterclaim Plaintiffs to execute documents for the Counterclaim Plaintiffs, obtain insurance for the Counterclaim Plaintiffs, receive and endorse checks for the Counterclaim Plaintiffs, and file claims for the Counterclaim Plaintiffs in order to "settle all obligations due to" DLP. *See* MSA § I.12.

76.13 Upon a default, DLP is also authorized to "debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to DLP FUNDING." *See* MSA § I.13.

SAUL EWING LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

76.14 Because the entire Purchased Amount of $19,507,676.79 less amounts remitted becomes due upon default, the MSA permits DLP to debit any or all of the Counterclaim Plaintiffs' bank accounts, collecting funds from any source, until the entire Purchased Amount is paid off.

76.15 The Counterclaim Plaintiffs were responsible for all collections of receivables, because receivables did not even become Future Receipts until collected and deposited.

77. All of the foregoing provisions of the MSA make clear that the DLP Borrowers, and not DLP, bore the risks of non-payment of accounts receivable under the MSA.

78. To the extent the MSA remains enforceable following entry into the Settlement Stipulation and entry of the Judgment, under New York law, the MSA represents a disguised loan, not a true purchase of receivables.

79. Because DLP did not purchase the Pre-Petition Accounts, Counterclaim Plaintiff Hronis held an interest in the Pre-Petition Accounts on the Petition Date.

80. The Pre-Petition Accounts are property of Counterclaim Plaintiff Hronis' estate under 11 U.S.C. § 541.

WHEREFORE, the Counterclaim Plaintiffs request entry of a declaratory judgment that (i) the MSA is a disguised loan; (ii) DLP did not purchase the Pre-Petition Accounts; (iii) Counterclaim Plaintiff Hronis owns, and has an interest in, the Pre-Petition Accounts; and (iv) Counterclaim Hronis' interest in the Pre-Petition Accounts is property of its estate under 11 U.S.C. § 541.

**Count V: Declaratory Judgment that the MSA Imposes a Usurious Rate of Interest Under Applicable California Law**

81. The Counterclaim Plaintiffs repeat each averment above and incorporate the same by this reference as through set forth here in full.

82. Under California law, parties to a contract are generally permitted to choose the law applicable to their contract. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a materially greater interest than the chosen state. *Washington Mutual Bank FA v. Superior Court*, 24 Cal. 4th 906, 916-917 (2001).

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

83. Pursuant to the California Constitution, Article XV § 1, the maximum annual interest rate that may be charged on a loan may not exceed the higher of 10% or the prevailing federal funds rate on the date of the execution of the loan, plus five percent (5%).

84. This usury limitation under California law cannot be waived by contract.

85. "[T]he unwaivable usury law enshrined in [California's] Constitution" is "a fundamental public policy of this state." *G Companies Mgmt., LLC v. LREP Arizona, LLC*, 88 Cal. App. 5th 342, 354, 304 Cal. Rptr. 3d 651, 660 (2023) (refusing to enforce contractual forum selection clause when enforcement would deprive plaintiff of the protections of California usury laws).

86. For the reasons set forth above, the MSA is, in reality, a disguised loan agreement.

87. The only connections the MSA or the parties thereto have to any state other than California are DLP's connections to New York and the choice of New York law in the MSA.

88. All other parties, businesses, operations, bank accounts, Future Receipts, Pre-Petition Accounts and Secured Assets are all located in California.

89. California has a materially greater interest in the DLP's and the Counterclaim Plaintiffs' disputes than New York and, therefore, California law applies to a determination of whether the MSA was usurious.

90. On the date of the MSA, the federal funds rate was four percent (4%), such that, under California law, the highest annual interest rate recognized under California law was ten percent (10%).

91. The MSA provided for weekly advances of funds from DLP to the DLP Borrowers of approximately $1.2 million per week. *See* MSA at 18.

92. The MSA provided for weekly payments from the DLP Borrowers of approximately $1.8 million per week. *See* MSA at 18.

93. This arrangement amounts to approximately fifty percent (50%) **weekly** interest, a usurious rate under California law.

94. To the extent the MSA remains enforceable following entry into the Settlement Stipulation and entry of the Judgment, the MSA was a disguised loan and the MSA's interest

provisions are void because the MSA imposes usurious interest rates. *Soleimany v. Narimanzadeh*, 78 Cal. App. 5th 915, 918, 294 Cal. Rptr. 3d 191, 192 (2022) (usurious loan's "interest provision is void, and the principal sum is deemed due at maturity of the note without interest").

WHEREFORE the Counterclaim Plaintiffs request entry of a declaratory judgment that (i) California's usury law applies to the MSA; (ii) all obligations imposed beyond the payment of principal under the MSA are void on account of the usurious interest under the MSA.

**<u>Count VII: Determination of Unsecured Status and Voiding Lien Pursuant to 11 U.S.C. §§ 506(a), (d)</u>**

95. The Counterclaim Plaintiffs repeat each averment above and incorporate the same by this reference as through set forth here in full.

96. Conterra's pre-Petition Date lien on the Pre-Petition Accounts attached to the Pre-Petition Accounts and was perfected earlier in time that any purported lien of DLP.

97. Conterra's pre-Petition Date lien on the Pre-Petition Accounts is senior to any lien of DLP on the Pre-Petition Accounts.

98. Pursuant to the Final DIP Order, Conterra's DIP Loan Lien is senior to any lien of DLP on the Pre-Petition Accounts.

99. The amount owed by the Debtors to Conterra on the Line of Credit exceeds $70 million.

100. The current principal amount owed by the Debtors to Conterra on the DIP Loan is approximately $18,275,000.

101. Counterclaim Plaintiff Hronis' interest in the Pre-Petition Accounts is less than $70 million.

102. Accordingly, the Pre-Petition Accounts are fully-encumbered by Conterra's DIP Loan Lien and prepetition senior lien on the Pre-Petition Accounts.

103. Because the amounts owed by the Debtors to Conterra under the Line of Credit and the DIP Loan exceed the value of the Pre-Petition Accounts, to the extent the MSA remains enforceable following entry into the Settlement Stipulation and entry of the Judgment, DLP holds no interest in the Pre-Petition Accounts and its claims, if any, against the Counterclaim Plaintiffs

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

related to the MSA, Settlement Stipulation or Judgment are general unsecured claims.

WHEREFORE, the Counterclaim Plaintiffs request entry of a judgment (i) determining that any claim of DLP is not secured by the Pre-Petition Accounts pursuant to 11 U.S.C. § 506(a); (ii) determining the any claim asserted by DLP is unsecured pursuant to 11 U.S.C. § 506(a); and (iii) voiding all purported liens of DLP pursuant to 11 U.S.C. § 506(d).

**Count VIII: Avoidance of Lien, Obligation and Purported Sales as Constructively Fraudulent Transfers Pursuant to 11 U.S.C. § 548(a)**

104. The Counterclaim Plaintiffs repeat each averment above and incorporate the same by this reference as through set forth here in full.

105. To the extent that the MSA imposes usurious interest, the interest component of the MSA is void under California law.

106. The MSA did not provide the Counterclaim Plaintiffs with "reasonably equivalent value" for the void obligation to pay interest.

107. Any lien arising from the MSA is a "transfer" of the Counterclaim Plaintiffs' interest in property for the purposes of 11 U.S.C. § 548.

108. The obligations under the MSA, and any lien arising therefrom, arose on or after November 14, 2025, less than two years prior to the Petition Date.

109. Any lien arising from the MSA does not secure reasonably equivalent value to the extent that it secures void obligations to pay usurious interest.

110. The MSA generally does not provide reasonably equivalent value to the Counterclaim Plaintiffs because (a) the MSA provides for weekly disbursements of approximately $1.2 million to the Counterclaim Plaintiffs; (b) the MSA provides for weekly payment of $1.8 million to DLP; and (c) the MSA provides no other administrative or collections benefits to the Counterclaim Plaintiffs, who are solely responsible for all collections activity.

111. The MSA effectively charges the Counterclaim Plaintiffs approximately $600,000 per week in order to allow the Counterclaim Plaintiffs access to $1.2 million at the start of a week instead of the start of the subsequent week.

112. Because of the timing of disbursements and sweeps, if the MSA had been fully

performed according to its terms, the Counterclaim Plaintiffs would have effectively paid over $6 million in interest to obtain access to $1.2 million a single week earlier than they would have done without the MSA.

113. Granting the Counterclaim Plaintiffs a single extra week of liquidity in the amount of $1.2 million is not reasonably equivalent to a cost of $6 million.

114. The MSA did not provide the Counterclaim Plaintiffs with reasonably equivalent value.

115. Any liens granted under the MSA to secure the obligations under the MSA were not in exchange for reasonably equivalent value.

116. On the date that each of the Counterclaim Plaintiffs entered into the MSA, each Counterclaim Plaintiffs' liabilities exceeded the value of their assets.

117. On the date that each of the Counterclaim Plaintiffs entered into the MSA, each of the Counterclaim Plaintiffs was insolvent or became insolvent as a result of the MSA.

118. On the date that each of the Counterclaim Plaintiffs entered into the MSA, each of the Counterclaim Plaintiffs was, or was about to, engage in business or transactions for which any property remaining with the Counterclaim Plaintiffs was an unreasonably small capital.

119. As evidenced by the Counterclaim Plaintiffs' near-immediate default on the MSA, the Counterclaim Plaintiffs did not have sufficient liquidity to repay their debts to creditors such as Conterra, DLP or ordinary-course vendors when due.

120. On the date that each of the Counterclaim Plaintiffs entered into the MSA, each of the Counterclaim Plaintiffs intended to incur, or believed it would incur, debts that would be beyond its ability to repay as these debts matured.

121. To the extent the MSA remains enforceable following entry into the Settlement Stipulation and entry of the Judgment, any lien granted to DLP under the MSA is a constructive fraudulent conveyance.

122. At the time DLP filed the DLP Complaint, DLP had advanced approximately $2.4 million to the DLP Borrowers.

123. DLP did not advance further amounts to the DLP Borrowers.

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

124. DLP asserted in the DLP Complaint that it is entitled to collect approximately $5 million from the DLP Borrowers, which amount includes repayment of principal plus fees, charges, and costs of suit.

125. In the Chapter 11 Cases, and via the Payover Notices, DLP alleges that it purchased the Pre-Petition Accounts, which have a face value of approximately $8 million.

126. DLP also asserts that it is owed the full unpaid amount of the Judgment.

127. If this Court determines that DLP purchased the Pre-Petition Accounts, then DLP's purchase of the Pre-Petition Accounts did not reduce the amount owed to DLP by a single dollar.

128. If DLP purchased the Pre-Petition Accounts in a manner that did not reduce the DLP Borrower's obligations to DLP, then the sale of the Pre-Petition Accounts did not provide reasonably equivalent value to the Counterclaim Plaintiffs.

WHEREFORE, the Counterclaim Plaintiffs request entry of a judgment (i) avoiding the Counterclaim Plaintiffs' obligations under the MSA pursuant to 11 U.S.C. § 548(a); (ii) avoiding DLP's liens pursuant to 11 U.S.C. § 548(a); and (iii) solely in the event this Court determines DLP did purchase the Pre-Petition Accounts, avoiding the sale of the Pre-Petition Accounts pursuant to 11 U.S.C. § 548(a).

**Count IX: Preservation and Recovery of Avoided Lien Pursuant to 11 U.S.C. §§ 550, 551**

129. The Counterclaim Plaintiffs repeat each averment above and incorporate the same by this reference as through set forth here in full.

130. The Counterclaim Plaintiffs are entitled to avoid any lien of DLP, and the underlying obligations imposed by the MSA under section 548 of the Bankruptcy Code.

131. DLP was the initial transferee of the lien, or the immediate or mediate transferee of such initial transferee or the person for whose benefit the lien was imposed.

132. Any lien of DLP avoided under section 548 of the Bankruptcy Code or voided under section 506(d) of the Bankruptcy is preserved and transferred to the Debtor Defendants' estates pursuant to 11 U.S.C. § 551.

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

WHEREFORE, the Counterclaim Plaintiffs request entry of a judgment preserving and transferring any lien of DLP to the estates of the Counterclaim Plaintiffs.

Dated: June 5, 2026

SAUL EWING LLP

By: */s/ Zev Shechtman*
Zev Shechtman
Attorneys for Hronis, Inc. and
affiliated Debtors and Debtors in Possession

SAUL EWING LLP
1888 Century Park East, Suite 1500
Los Angeles, California 90067
(310) 255-6100